IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MINNESOTA

Theressa Burns,

                    Plaintiff,

v.                                          Civil Action #   _____

Dennis McDonough, Secretary,
Department of Veterans Affairs;
Patrick Kelly; Brian Taylor;
Michael Armstrong; and
Mandelynn Smoot,

                    Defendants.

## COMPLAINT

Plaintiff, Theressa Burns, for her complaint against the named Defendants, states and alleges as follows:

### The Parties

1.      Plaintiff Theressa Burns is a citizen of the United States of America residing at 795 Butternut Avenue, St. Paul, Minnesota 55102.

2.      Defendant Department of Veterans Affairs and specifically the Minneapolis Veterans Affairs Medical Center under Secretary, Dennis McDonough, is the Agency located at One Veterans Drive, Minneapolis, Minnesota 55417.

11/21/21 V.3

1

3.      Patrick Kelly is the Director of the Minneapolis VA Medical Center and was personally involved in the matters which are the subject of this Complaint.

4.      Brian Taylor is a Compliance Officer for the office of Business Integrity at the Minneapolis VA Medical Center and was personally involved in the matters which are the subject of this Complaint.

5.      Michael Armstrong is a physician and the Director of Extended Care & Rehabilitation at the Minneapolis VA Medical Center and was personally involved in the matters which are the subject of this Complaint.

6.      Mandelynn Smoot was Chief Occupational Therapist at the time of these events and then promoted to Director of Rehabilitation at the Minneapolis VA Medical Center and was personally involved in the matters which are the subject of this Complaint.

**Jurisdiction and Venue**

7.      This Court has jurisdiction over this matter pursuant to the order of Administrative Judge Dorothy L Moran (Docket number CH-0752-21-0372-1-1) and 5 U.S.C. § 7703(b )(2).

8.      This Court has jurisdiction over this matter pursuant to Title 17 of the United States Code, and 28 U.S.C. § 1338.  Venue is proper pursuant to 28 U.S.C. §§ 1391(c) and 1400(a).

11/21/21 V.3                                                                                          2

## General Allegations

9.     The Final Decision of Administrative Judge Dorothy L. Moran of the Merit Systems Protection Board (MSPB) of October 21, 2021, alleges Plaintiff failed to make nonfrivolous allegations that the Board has jurisdiction over her appeal as the retirement was voluntary.

10.     The decision incorrectly states that the issue involved the Appellant's involvement with the development of a VA program entitled Cognitive Performance Test (CPT), and that according to the Appellant, this was her program that she developed and copyrighted for herself while a VA employee.

11.     The decision erroneously agreed with the Administrative Investigative Board (AIB) report of January 3, 2020, by VA Compliance Officer, Brian Taylor, that Plaintiff was found to have violated numerous federal employee ethical regulations and violated agency ethical policies, which included supplementing her government salary by collecting honorariums for speaking engagements as a VA employee.

12.     The decision incorrectly states that on July 31, 2020, the deciding official, Patrick Kelly, the VA Medical Center Director, decided to remove the appellant for the charged conduct effective August 9, 2020.  However, before the removal became effective, the appellant retired from the VA effective August 7, 2020.  The record makes clear, the appellant was not removed from service, she retired from service.

11/21/21 V.3

13.     Contrary to the decision of the MSPB, the Final Agency Decision (FAD) of May 27, 2021, concluded the opposite: "Complainant was removed from federal service by decision dated July 31, 2020, effective August 9, 2020. Complainant retired from federal service effective August 7, 2020, only after her removal had been decided. We do not analyze Complainant's case as a constructive discharge because we find that Complainant was removed for legitimate, nondiscriminatory reasons."

14.     In fact, the discrimination and harassment to force Plaintiff's resignation had commenced prior to the efforts to remove her thru an AIB and is documented in the Agency Report of Investigation (ROI) of her Complaint of Employment Discrimination.

15.     Absent to the contrary, retirement is presumed to be a voluntary act beyond the Board's jurisdiction. An involuntary retirement, however, is equivalent to a forced removal and therefore within the Board's jurisdiction. *See Garcia v. Department of Homeland Security, 437 F.3d 1332, 1330 (Fed. Cir. 2006).*

16.     To overcome the presumption of a retirement's voluntariness, the employee must show that it was the result of the agency's misinformation or deception or was coerced by the agency. *See Hosozawa v. Department of Veterans Affairs, 113 M.S.P.R. 110, 113 (2010)*; *Axsom v. Department of Veterans Affairs, 110 M.S.P.R. 605, 610 (2009).*

17.     The common element in all cases of involuntary retirement is that factors have operated to the employee's decision-making process depriving her of freedom of choice. *See Scharf v. Department of the Air Force, 710 F.2d 1572, 1574-1575 (Fed. Cir. 1983).*

18.     Ms. Burns had been an employee of the Minneapolis VA Geriatric Research, Education & Clinical Center (GRECC) since 1987 and was promoted to the GS-12 Occupational Therapist Clinical Specialist in 2010.  She was hired by James A. Mortimer, PhD, to incorporate her Cognitive Performance Test (CPT) as part of a NIA longitudinal study of Alzheimer's disease (AD) progression.  Her credentials and official duties enabled the agreed upon scope of her practice and work for 35 years which was well established.

19.     Plaintiff was recruited to her long-held VA position by the Minneapolis VA GRECC to employ her copyrighted CPT in the clinical care of Veterans and in its outcome research.  She was not recruited to transfer, or to donate, her established legal rights to her intellectual property to the VA.

20.     Dr. Mortimer served as an Expert Witness for the federal legal proceedings in 2010, as reflected in his Letter of September 27, 2009.  The 2010 proceedings were held under the auspices of Magistrate Judge Susan Nelson, and Plaintiff's sole copyrights were and already have been upheld (TX 6-006-512; TX 8-964-548).

21.     Dr. Mortimer testified as to the origination of the CPT stating that "when

Theressa Burns was initially hired to work in the GRECC at the Minneapolis VA Medical Center in 1987, the tasks that constitute the Cognitive Performance Test <u>were already designed</u>."

22.     Dr. Mortimer further stated that the CPT was not developed using US government resources or time, that she developed them independently before they were applied to a research study in collaboration with him, which led to a publication in the <u>Journal of Geriatric Psychiatry and Neurology</u>.  He stated that although the research study leading to the first scientific publication describing the test was conducted on VA time, for which the VA benefited, that: "It is important to emphasize that the design of the Cognitive Performance Test pre-dated her employment in the Geriatric Research, Education and Clinical Center."

23.     Prior to and related to the federal legal proceedings of 2010, the origination of the CPT had already been investigated by the University of Minnesota (UMN), through the Agency, in a 2005 Freedom of Information Act (FOIA) request.  The FOIA Letter and VA Documents of 2005 that were sent to the UMN by the Minneapolis VA Medical Center, including several CPT manuals, specifically stated that the Agency maintained several copies of the CPT manual at the facility, all which displayed Plaintiff's copyright notification clearly listed on the covers.

24.     In 2006, Plaintiff agreed to a signed Settlement Agreement with the UMN to stop the infringement of her intellectual property rights.  The subsequent Order of Magistrate Judge Susan Nelson of March 16, 2010, upheld the previous agreement in 2006 with the UMN.

25.   The Minneapolis GRECC was one of the first six GRECCs initiated by VHA in 1975 to attract credentialed scientists and clinicians, and health science students to the field of Geriatrics to increase applied knowledge of aging and geriatric service delivery.  GRECCs implement new models of care and transmit this newly acquired research with education and training programs, for broad dissemination beyond the GRECC, if the program is found to be effective.  GRECCs have a primary responsibility for translating new and existing geriatric knowledge and skills into clinical practice through their actions as local, regional, and national resources for geriatric education and training (VHA GRECC Handbook 1140.08.1).

26.   For 35 years, Plaintiff had provided these education and clinical training programs per both the GRECC Mission and her official duties which included clinical research and the development of Clinical Demonstration Models.  Plaintiff's official GS-12 Functional Statement also set forth these publishing, teaching, and research activities as her current official duties and roles.

27.   On April 17, 2018, supervisor, Dr. McCarten, called Plaintiff to the meeting described in her affidavit for the Agency Report of Investigation (ROI).  She suddenly discovered that GRECC neuropsychologist Dr. Hemmy was given full control of her protected research and had prepared analyses and interpretations without Plaintiff being consulted. Plaintiff then was first told she would be moved out of the GRECC department to the department of OT Rehabilitation and under Chief Occupational Therapist, Mandy Smoot.

28.     In February of 2018, and just prior to the meeting on April 17, 2018, a manuscript co-authored by Plaintiff and Dr. McCarten, and other GRECC authors, entitled: *"Predictive Value of the Cognitive Performance Test (CPT) for Staging Function and Fitness to Drive in People with Neurocognitive Disorders"* was accepted for publication in the July/August issue of the American Journal of Occupational Therapy (AJOT).  As lead author, Plaintiff proposed further data analyses to build on the study in AJOT and had requested that GRECC neuropsychologist, Dr. Hemmy, prepare theses analyses from the GRECC data base.  Other GRECC staff were included, and the project was again initiated as a collaborative team effort.

29.     However, just prior to the meeting of April 17, 2018, Plaintiff discovered that Dr. Hemmy was newly designated as lead author and had conducted her own analyses and had published findings inconsistent with the already widely published occupational therapy practice model without the input of Ms. Burns.  Plaintiff was largely left out of the project except by reference in using her name as an author and with reference to her AJOT publication, both listed on the GRECC Poster they had prepared for VA Research Day.

30.     After she opposed this discriminatory conduct, as a further reprisal, Dr. McCarten rescinded the action to move her out of the GRECC but refused to collaborate on future research and intended to proceed with Dr. Hemmy on his own without Plaintiff.  As they control the extensive GRECC data base where occupational therapy test scores and patient profiles are stored, she was essentially crippled from her long-standing occupational therapy research, and her long-standing key occupational therapy employment role.

31.     Plaintiff subsequently met with Dr. Kotz, GRECC Associate Director for Research, on April 25, 2018, and made the first verbal complaint of unlawful discrimination at that meeting. Although Dr. Kotz intervened and the discriminatory conduct with respect to her research was slowed itself, her official GRECC education programs and related GRECC publications were eventually called into question next, by Mandy Smoot; an AIB then convened and was forced to deal with Plaintiff's alleged misconduct.

32.     The Agency convened two Administrative Investigative Boards with Plaintiff and numerous witnesses on October 11 and November 15 of 2019. Compliance Officer Brian Taylor chaired both investigations. The AIBs were initiated by Mandy Smoot, who contacted Brian Taylor in the Compliance Office with her unsubstantiated and false accusations that Plaintiff had misused her government position and title in relation to her official teaching and research roles. Defendant Mandy Smoot misrepresented the conduct of Plaintiff and falsely testified that she promoted sales in her official capacity and roles.

33.     However, in the Expert Letters handed to Director Kelly on June 25, 2020, these false allegations of sales and honorariums were refuted by both the Minnesota Occupational Therapy Association, and by Saint Catherine University, where Plaintiff has taught the GRECC sponsored education programs for the 35 years.

34.     Plaintiff was accused by Defendant Brian Taylor of accepting large compensations from prohibited sources, when nearly all teaching activities were conducted on tour with VA pay, and for which she never received any additional compensation. Plaintiff

infrequently accepted a $600 compensation in her official capacity under Paragraph 3 of 5 CFR 2635.807 for the GRECC sponsored education program only if taught off-tour, as on a Saturday. Paragraph 3 of 5 CFR 2635.807 was added in 2001 to allow for the exceptions for accepting compensation for teaching, speaking, and writing activities that relate to the employee's official duties and roles.

35.     Chief Occupational Therapist Mandy Smoot, outlined the policy to Brian Taylor at the AIB on November 8, 2019:  Brian Taylor asked:

"You adjust the shift or comp time?"  Mandy Smoot answered: "We adjust the shift or do comp time or travel status, if its off site.  But the locations we speak at do always offer honorariums for the speaking.  If you do AL, you could do the honorarium, but I think people choose to make more money on official duty talking about our stuff."

36.     Plaintiff testified for the AIB that she was denied tour changes by HR for Saturday education programs to be paid on tour.

37.     Defendant Mandy Smoot further reported in her November 8, 2019, testimony to the AIB in response to Brian Taylor's question:

"Ms. Burns testified that she shared the MAYO flier on training with you, and that you requested her to provide the training here.  Is that a correct statement?"  Mandy Smoot admitted and stated: "Oh, I know that she sent it to me and said she thought it would be a good idea to do this partnership.  I do not know how I responded."

38.     In fact, Plaintiff provided the email correspondence of May 8, 2019, prior to the AIB, when Mandy Smoot responded to the email send of the MAYO flier:

"Is this a course you would be willing to teach here in a couple of sessions so we could get say ¼ of our staff there at a time?  Maybe a blocked morning instead of hit and miss one hours would be more beneficial.  I too like their objectives and the way it is designed."

39.     The AIB was convened on October 1, 2019, just after Defendant Mandy Smoot

invited Plaintiff on May 8, 2019, to teach the GRECC sponsored CPT education program to her

staff at the facility.  According to their own testimony, the AIB was initiated by Mandy Smoot

through Compliance Officer Brian Taylor to investigate and charge Plaintiff with violations in

"promoting" and publishing what they incorrectly and falsely characterized or inferred as a

personal program rather than the widely published GRECC sponsored program she had taught

for over 30 years.


40.     When Dr. McCarten testified for the AIB on November 7, 2019, Brian Taylor

asked:

"So, if she says she wants to go speak at the MAYO, but MAYO doesn't have time for us except
for on Saturdays.  The only way I can speak to MAYO residents or MAYO providers is if I can
do it on Saturday, and she came to you with that request, would you be reasonable to
accommodating that request?"

Dr. McCarten answered:

"Yes."  Brian Taylor goes on to ask: "Is it a specific Task of hers in her performance to expand
the CPT out of Minneapolis, Minnesota Region?"  Dr. McCarten answered: "Yes, in that our
mission is to expand clinical models of care.  This is a clinical model, yes."


41.     Defendant Brian Taylor spent much of the two AIB processes to investigate the

origination of the CPT and to discrete Plaintiff's sole copyrights, when she had provided all

previous FOIA documents and related legal documents to the federal legal proceedings of 2010.

Brian Taylor accused Plaintiff of refusing to submit her property to the VA Technology Transfer

Program.  However, that VA program is for new inventions and not those already publicly

disclosed, and already owned.

42.     GRECC Associate Director for Research, Dr. Kotz concurred in her email of

March 14, 2019, which states:

"My recommendation would be to NOT submit these forms.  I do not feel any of this is
necessary.  I am waiting a return phone call from Josh Nixon to determine from a VA standpoint,
what the purpose was of initiating this process."

43.     Despite all documents and testimony provided to the AIB which overwhelmingly

refuted the alleged violations of misuse of government position and official title and roles, the

AIB falsely charged that the violations were true.

44.     Although the AIB was concluded on January 3, 2020, Plaintiff was not told the

outcome to until the May 11, 2020, meeting with Defendant Michael Armstrong, who proposed

her removal from office rather than her promotion due both my merit and by seniority; he also

threatened to report her to the Department of Health and Human Services at the State of

Minnesota to have her professional license to practice removed.

45.     Prior to Chief Occupational Therapist Mandy Smoot initiating and testifying for

the AIB, she had individually and abruptly literally and physically walled Plaintiff off from the

Occupational Therapy Department.  Specifically, among other things, Plaintiff was suddenly

removed from the receipt of occupational therapy group emails and directives being given to

qualify for and apply for the promotions.

After this isolation, Defendant Mandy Smoot assisted and encouraged much less qualified and

younger inexperienced staff to apply for and receive the ensuing system-wide promotions

pending for the entire profession.

46.     In her November 8, 2019, testimony to the AIB, Mandy Smoot states:

"They asked me to take over supervision of her, probably two years ago, because they were struggling with the relationships there.  And I refused to do so."  Brian Taylor, asked: "Why?"  Mandy Smoot responded: "Because she is very difficult."

Brian Taylor asked:

"Okay.  What was your official reason?"  Mandy Smoot answered: "My official reason is she is difficult.  She is not acting as a clinical OT.  She really isn't.  She is functioning within GRECC.  Her only skill set, in my opinion, is in execution of the CPT.  She hasn't acted as a treating OT in at least since I've been here."

47.     However, this is contrary to the easily accessible record.  Every GRECC submits to VACO an annual report of the prior fiscal year activities and accomplishments of quantitative information on research and education funding, personnel and their time distribution, publications, trainees and fellows, conferences, and clinical demonstrations, that is entered into a data base accessible through the VA Intranet (VHA Handbook 1140.08.1).

48.     Plaintiff's critical and unique quantitative information had been set forth in the GRECC annual reports for over 30 years along with all other GRECC personnel who have not been discriminated against for their work, and who also own the intellectual property that is the subject of their teaching activities and research.  Also included in the widely known and convenient GRECC annual reports for over 30 years was Plaintiff's Curriculum Vitae, listing 18 peer reviewed publications in scientific Journals, five academic book chapters, and 26 abstracts and scholarly presentations at local, national, and international, scientific meetings.

49.     After the conclusion of the AIB, Dr. McCarten inquired about the procedure to recommend the upgrade for Plaintiff to the GS-13 Clinical Specialist promotion.  However, in

their email correspondence of December 16, 2019, Mandy Smoot explained there were limited

upgrades available for the GS-13 clinical specialist level and falsely stated only that Plaintiff was

"not necessarily qualified" with no other reason given.

50.     Under the Merit System, promotions are based on merit and Plaintiff's merit-

based credentials far exceeded any other OT on staff at the facility.  The GS-13 upgrade criteria

for occupational therapist clinical specialists were specific as to the advancement of occupational

therapy evidence-based practice and the standard or criteria of having potential for publishing

and research.  These were milestones and advancement criterion of management that Plaintiff

had already achieved and had already surpassed as evidenced by the numerous GRECC annual

reports reviewed by the AIB in testimony with Plaintiff on November 15, 2019.

51.     Plaintiff's official GS-12 Functional Statement also set forth these publishing and

research activities as her current official duties and roles.  Even though the qualification

standards were already listed on her GS-12 Functional Statement since 2010; Defendant Mandy

Smoot still somehow characterized Plaintiff as lacking in the contemporary qualifications and

skills necessary for the promotion.

52.     Defendant Mandy Smoot falsely advised Dr. McCarten that Plaintiff's official

GS-12 Functional Statement would need to be rewritten and significant changes made to meet

the already well met and obvious well in qualification standards for the GS-13 clinical specialist

promotion.

53.     Plaintiff's willful wrongful removal from office with huge consequence not only to VA but to her, among other things, resulted in a denial of the GS-13 promotion due to her both by merit and by seniority.  Despite the advice given by Mandy Smoot, however, Dr. McCarten did recommend her for the GS-13 promotion in his Letter of February 25, 2020, after the conclusion of the AIB on January 3, 2020.  Yet she was not told the outcome of the AIB to until the May 11, 2020, meeting with Defendant Michael Armstrong who proposed her removal from office rather than her promotion.

54.     The Final Agency Decision (FAD) of May 27, 2021, concluded:

"We note that resisting harassing discriminatory conduct qualifies as protected EEO activity under federal EEO law (demanding a supervisor stop harassment is a protected opposition, i.e., when one resists or confronts the unlawful harassment).  Nonetheless, Complainant has produced no evidence, and there is none in the record, that she engaged in opposition.  Furthermore, Complainant's EEO case did not begin until after management had proposed discipline based on the evidence of Complainant's violation of ethical rules and regulations."

55.     In fact, the discrimination and harassment to force Plaintiff's resignation had commenced prior to the efforts to remove her through an AIB and is well documented in the Agency's Report of Investigation (ROI).

56.     The FAD in fact concluded that Plaintiff was removed from her position of 35 years on July 31, 2020, and retired from federal service effective August 7, 2020, only after her removal had been decided.

**COUNT I**

## UNLAWFUL TERMINATION AND FORCED RETIREMENT

57.     Allegations from paragraphs 13 - 17, 32 – 44, 53 of this Complaint are hereby restated and incorporated by reference.

58.     The Final Agency Decision (FAD) of May 27, 2021, states: "We note that resisting harassing discriminatory conduct qualifies as protected EEO activity under federal EEO law (demanding a supervisor stop harassment is a protected opposition, i.e., when one resists or confronts the unlawful harassment).  Nonetheless, Complainant has produced no evidence, and there is none in the record, that she engaged in opposition.  Furthermore, Complainant's EEO case did not begin until after management had proposed discipline based on the evidence of Complainant's violation of ethical rules and regulations."

59.     In fact, the discrimination and harassment to force Plaintiff's resignation commenced prior to the efforts to remove her through an AIB and is well documented in the Agency's Report of Investigation (ROI) of the Complaint of Employment Discrimination.

60.     The FAD concluded that Plaintiff was removed from her position of 35 years on July 31, 2020, and retired from federal service effective August 7, 2020, only after her removal had been decided.

61.     Defendant Patrick Kelly removed Plaintiff from her position of 35 years on July 31, 2020, by Decision Letter delivered to her home on the same day.

62.     Plaintiff retired from federal service effective August 7, 2020, only after her removal from office and forced retirement and the loss of income.


# COUNT II
## DISCRIMINATION AND HOSTILE WORK ENVIRONMENT

63.     Allegations from paragraphs 16 - 53 of this Complaint are hereby restated and incorporated by reference.


64.     Management stripped Plaintiff of her long-standing official duties, protected research, and education roles, and gave unfair advantage and preferential treatment to others who would assume the work.


65.     When she opposed the discriminatory conduct at the April 17, 2018, meeting; Plaintiff was charged, in reprisal, with violations of the law.


66.     The Agency managers used the AIB process to degrade, and defame, and to ultimately terminate Ms. Burns.


67.     Review of the procedural stages on the harms and takings to date, as indicated essentially results in a clear indication of a succession of "rubber stamping" much sadly at the expense of the VA, and Plaintiff.  A legal and moral obligation exists and indeed a trusteeship exists for review of earlier findings with care: This was not done.

11/21/21 V.3

68.     This "rubber stamp" review was essentially of the work and the false findings of Defendant Brian Taylor, who was the chief input for the AIB to alert them to address the issue of discrimination and harassment.

69.     Defendant Brian Taylor has essentially knowing, repeated untruths which are echoed by further processes without the required diligence and comportment with law.

## COUNT III
## AGE DISCRIMINATION

70.     Allegations from paragraphs 45 - 53 of this Complaint are hereby restated and incorporated by reference.

71.     Prior to Chief Occupational Therapist Mandy Smoot initiating and testifying for the AIB, she individually and abruptly literally and physically walled Plaintiff off from the Occupational Therapy Department.  Specifically, among other things, Plaintiff was suddenly removed from the receipt of occupational therapy group emails and directives being given to qualify for and apply for the promotions.  After this isolation, Mandy Smoot assisted and encouraged much less qualified and younger inexperienced staff to apply for and receive the ensuing system-wide promotions pending for the entire profession.

72.     In her November 8, 2019, testimony to the AIB, Defendant Mandy Smoot states:

"They asked me to take over supervision of her, probably two years ago, because they were struggling with the relationships there. And I refused to do so." Brian Taylor, asked: "Why?" Mandy Smoot responded: "Because she is very difficult." Brian Taylor asked: "Okay. What was your official reason?" Mandy Smoot answered: "My official reason is she is difficult. She is not acting as a clinical OT. She really isn't. She is functioning within GRECC. Her only skill set, in my opinion, is in execution of the CPT. She hasn't acted as a treating OT in at least since I've been here."

73.     However, this is contrary to the pervasive or easily available record. Every GRECC submits to VACO an annual report of the prior fiscal year activities and accomplishments of quantitative information on research and education funding, personnel and their time distribution, publications, trainees and fellows, conferences, and clinical demonstrations, that is entered into a data base accessible through the VA Intranet (VHA Handbook 1140.08.1).

74.     Plaintiff's critical and unique quantitative information had been set forth in the GRECC annual reports for over 30 years along with all other GRECC personnel who have not been discriminated against for their work, and who also own the intellectual property that is the subject of their teaching activities and research. Also included in the widely known and convenient GRECC annual reports for over 30 years was her Curriculum Vitae, listing 18 peer reviewed publications in scientific Journals, five academic book chapters, and 26 abstracts and scholarly presentations at local, national, and international scientific meetings.

## COUNT IV
## DENIAL OF PROMOTION

75.     Allegations from paragraphs 45 - 56 of this Complaint are hereby restated and incorporated by reference.

76.     After the conclusion of the AIB, Dr. McCarten inquired about the procedure to recommend the upgrade for Plaintiff to the GS-13 Clinical Specialist promotion.  Defendant Mandy Smoot explained in her email of December 16, 2019, there were limited upgrades available for the GS-13 clinical specialist level and stated only that she was "not necessarily qualified" with no other reason given.

77.     Under the Merit System, promotions are based on merit and Plaintiff's merit-based credentials far exceeded any other OT on staff at the facility.  The GS-13 upgrade criteria for occupational therapist clinical specialists were specific as to the advancement of occupational therapy evidence-based practice and the standard or criteria of having potential for publishing and research.  These were milestones and advancement criterion of management that Plaintiff had already achieved and had already surpassed as evidenced by the numerous GRECC annual reports reviewed by the AIB in testimony with Plaintiff on November 15, 2019.

78.     Plaintiff's official GS-12 Functional Statement also set forth these publishing and research activities as her current official duties and roles.  Even though the qualification standards were already listed on her GS-12 Functional Statement since 2010; Defendant Mandy

11/21/21 V.3

20

Smoot still somehow characterized Plaintiff as lacking in the contemporary qualifications and skills necessary for the promotion.

79.     Defendant Mandy Smoot falsely advised that Plaintiff's official GS-12 Functional Statement would need to be rewritten and significant changes made to meet the already well met and obvious well in qualification standards for the GS-13 clinical specialist promotion.

80.     Plaintiff's willful wrongful removal from office with huge consequence not only to VA but to her, among other things, resulted in a denial of the GS-13 promotion due to her both by merit and by seniority.  Despite the advice given by Mandy Smoot, however, Dr. McCarten did recommend her for the GS-13 promotion in his Letter of February 25, 2020, after the conclusion of the AIB on January 3, 2020.  Yet she was not told the outcome of the AIB to until the May 11, 2020, meeting with Defendant Michael Armstrong who proposed her removal from office rather than her promotion.

**COUNT V**
**MALICIOUS PROSECUTION AND ABUSE OF PROCESS**

81.     Allegations from paragraphs 31-43 of this Complaint are hereby restated and incorporated by reference.

82.     Plaintiff met with Dr. Kotz, GRECC Associate Director for Research, on April 25, 2018, and made the first verbal complaint of unlawful discrimination at that meeting.

Although Dr. Kotz intervened and the discriminatory conduct with respect to her research was slowed itself, her official GRECC education programs and related GRECC publications were eventually called into question by Mandy Smoot; an AIB then convened and was forced to deal with her alleged misconduct.

83.    The Agency convened two Administrative Investigative Boards on October 11 and November 15 of 2019. The AIBs were initiated by Mandy Smoot, who contacted Brian Taylor in the Compliance Office with her unsubstantiated and false accusations that Plaintiff had misused her government position and title in relation to her official teaching and research roles. Defendant Mandy Smoot misrepresented the conduct of Plaintiff and falsely testified she promoted sales in her official capacity and roles.

84.    Despite the documents and testimony given to the AIB which overwhelmingly refuted the alleged violations, the AIB falsely charged that the violations were true. The AIB report by Brian Taylor then went to be reviewed at the next level, Michael Armstrong, who wrote the Agency's May 11, 2020, Proposed Removal Letter, upheld by Patrick Kelly, who wrote the Agency Decision Letter and removed Plaintiff from her specialty practice of 35 years, causing very substantial damages. The review process was essentially unlawful "rubber stamps" and echoing the untruthful and misleading Brian Taylor AIB Report; and not reflecting the presumed duties and legal objective in a review process.

## COUNT VI
## DEFAMATION PER SE

85.     Allegations from paragraphs 32 - 43, 46 - 52 of this Complaint are hereby restated and incorporated by references.

86.     Ms. Burns had been an employee of the Minneapolis VA Geriatric Research, Education & Clinical Center (GRECC) since 1987 and was promoted to the GS-12 Occupational Therapist Clinical Specialist in 2010.  She was hired by James A. Mortimer, PhD, to incorporate her Cognitive Performance Test (CPT) as part of a NIA longitudinal study of Alzheimer's disease (AD) progression.  Her credentials and official duties enabled the agreed upon scope of her practice and work for 35 years which was well established.

87.     The Minneapolis GRECC was one of the first six GRECCs initiated by VHA in 1975 to attract credentialed scientists, clinicians, and health science students to the field of Geriatrics to increase applied knowledge of aging and geriatric service delivery and implement new models of care and transmit this newly acquired research and knowledge with education and training programs, for broad dissemination beyond the GRECC, if the program is found to be effective.  GRECCs have a primary responsibility for translating new and existing geriatric knowledge and skills into clinical practice through their actions as local, regional, and national resources for geriatric education and training (VHA GRECC Handbook 1140.08.1).

88.     For 35 years, Plaintiff had provided these education and clinical training programs per both the GRECC Mission and her official duties which included clinical research and the

11/21/21 V.3

development of Clinical Demonstration Models.  Plaintiff's official GS-12 Functional Statement also set forth these publishing, teaching, and research activities as her current official duties and roles.

89.     Defendant Mandy Smoot contacted Brian Taylor in the Compliance Office with her unsubstantiated and false accusations that Plaintiff had misused her government position and title in relation to her official teaching and publishing roles.  Mandy Smoot misrepresented the clinical skills and programs and conduct of Plaintiff and falsely testified she promoted sales of the CPT in her official capacity and roles.

## COUNT VII
## COPYRIGHT INFRINGEMENT

90.     Allegations from paragraphs 18 - 24, 27 - 30, 41 - 43 of this Complaint are hereby restated and incorporated by reference.

91.     Ms. Burns has complied in all respects with the provisions of the copyright laws of the United States, 17 U.S.C. § 101, et seq., and has secured its rights and privileges in the original CPT work and derivatives thereof and has obtained Certificates of Registration from the Register of Copyrights, the United States Copyright Office.

92.     Ms. Burns' original CPT and derivatives thereof protected by her copyright registrations are each original and constitute copyrightable subject matter.

11/21/21 V.3

93.     The exclusive rights granted to copyright owner's under 17 USC § 106 include: (a) the right to reproduce the copyrighted work in copies; (b) the right to prepare derivative works on the copyrighted work; and (c) the right to distribute copies of the copyrighted work to the public by loan, sale, lease, or rental.

94.     The Agency barred Plaintiff from conducting her official duties and long-standing role in CPT education which included distribution of the test administration manual, for over 30 years, given at no cost to occupational therapy practitioners, through the GRECC program.

95.     Defendant Brian Taylor used the AIB process to discredit the origination of the CPT and to pressure transfer of copyrights to the VA, despite Plaintiff had provided all previous FOIA documents and related legal documents of the 2010 federal proceedings. Brian Taylor accused Plaintiff of refusing to submit her property to the VA Technology Transfer Program, when that VA program is for new inventions and not those already publicly disclosed, and already owned: All of which precludes filing for VA Patent coverage.

96.     GRECC Associate Director for Research, Dr. Kotz concurred in her email of March 14, 2019, which states: "My recommendation would be to NOT submit these forms. I do not feel any of this is necessary. I am waiting a return phone call from Josh Nixon to determine from a VA standpoint, what the purpose was of initiating this process."

97.     Pursuant to 17 U.S.C. § 105, an infringer is one who violates the exclusive right of the copyright owner as provided by 17 U.S.C. § 106.

11/21/21 V.3                                                                                                  25

## COUNT VIII
## LANHAM ACT

98.     The allegations of paragraphs 10, 19 - 22, 27 - 30, 39 of this Complaint are hereby restated and incorporated by reference.

99.     On April 17, 2018, Plaintiff was called to the meeting described in her affidavit for the Agency Report of Investigation (ROI).  She had discovered that GRECC neuropsychologist Dr. Hemmy was given full control of her protected research and had prepared analyses and interpretations without Plaintiff being consulted.

100.    In February of 2018, a manuscript co-authored by Plaintiff and other GRECC authors, entitled:  "Predictive Value of the Cognitive Performance Test (CPT) for Staging Function and Fitness to Drive in People with Neurocognitive Disorders" was accepted for publication in the American Journal of Occupational Therapy (AJOT).  As lead author, Plaintiff proposed further data analyses to build on the study in AJOT and requested that GRECC neuropsychologist, Dr. Hemmy, prepare theses analyses from the GRECC data base.  Other GRECC staff were included, and the project was again initiated as a collaborative team effort.

101.    However, Plaintiff suddenly discovered that Dr. Hemmy had been newly designated as lead author and had conducted her own analyses and had published findings inconsistent with the already widely published occupational therapy practice model without the input of Ms. Burns.  Plaintiff was largely left out of the project except by reference in using her

name as an author and with reference to her AJOT publication, both listed on the GRECC Poster they had prepared for VA Research Day.

102.    This count is made pursuant to Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a).

103.    In connection with the distribution of goods and services, the Defendants have used words, terms, names, symbols, and devices (e.g., Ms. Burns' name, Ms. Burns' likeness, and Ms. Burns' work taking credit for that work as their own) all without Ms. Burns' permission or consent.

104.    Such use is likely to cause confusion, or to cause mistake, or to deceive members of the public suggesting that there is an affiliation, connection, or association between Defendants and Ms. Burns which does not exist.

105.    Such use is also likely to cause confusion, or to cause mistake, or to deceive members of the public as to the origin of Defendants' goods and services.

106.    Plaintiff has been damaged by Defendants' conduct.  As such, Plaintiff is entitled to relief under Section 43(a) of the Lanham Act.

## DEMAND FOR JUDGMENT

1.      Wherefore, Plaintiff prays for entry of judgment in favor of the Plaintiff and

against Defendants providing:


## RETIREMENT DEDUCTIONS AND BACKPAY

2.      The Equal Employment Opportunity Commission (EEOC) has held that make

whole relief requires the agency to make retroactive tax-deferred contributions to the

complainant's retirement account for the relevant period.  To the extent complainant would have

received agency contributions to a retirement fund as a component of her salary, she is entitled to

have her retirement benefits adjusted as part of her back pay award, including sums which the

account would have earned during the relevant period.  The agency should provide its

calculations of the amount of contributions to the agency's retirement system that both it and

complainant would have made during her absence, as well as the earnings which would have

accrued.


3.      When the finding of discrimination involves a performance appraisal, the

appropriate relief should include raising the rating to that which the individual would have

received absent the discrimination. McKenzie v. Dep't. of Justice, EEOC Appeal No.

0120100034 (July 7, 2011); Hairston v. Dep't. of Education, EEOC Appeal No. 0120071308

(Apr. 15, 2010).  In addition, the individual is entitled to all benefits and awards that s/he would

have received if she had achieved the higher performance appraisal rating. Cook v. Dep't. of

Labor, EEOC Appeal No. 0720080045 (Feb. 22, 2010).


11/21/21 V.3

4.      For Damages in excess of 50,000 pursuant to all Counts of this Complaint.

5.      Attorney's Fees.

6.      And any other and further relief in favor of the Plaintiff and against Defendants as the court deems just and equitable.

## JURY DEMAND

Pursuant to Federal Rule of Civil Procedure 38, Plaintiff demands a trial by jury of all issues so triable.

11/21/21 V.3

_Richard A. Saliterman_

Richard A. Saliterman
Attorney at Law
rsaliterman@saliterman-law.com

SALITERMAN & SIEFFERMAN, P.C.
ATTORNEYS AT LAW
Canadian Pacific Plaza Building
Suite 2320
120 South Sixth Street
Minneapolis, Minnesota 55402
612.339.1400 (Direct)
612.349.2908 (Fax)

_November 21, 2021_
Date

_Theressa A. Burns_

Theressa A. Burns, OTR/L
Occupational Therapist Clinical Specialist
795 Butternut Avenue
Saint Paul, MN 55102
651-292-9648

_November 21, 2021_
Date

Plaintiff

11/21/21 V.3

30